Judgment rendered November 20, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,225-JAC

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA
IN THE INTEREST OF
J.C.

* * * * *

Appealed from the
Minden City Court, Ward One
Parish of Webster, Louisiana
Trial Court No. J4048-16.6

Honorable C. Sherburne Sentell, III, Judge

* * * * *

LOUISIANA APPELLATE PROJECT
By: Katherine M. Franks

J. SCHUYLER MARVIN
District Attorney

JOHN M. LAWRENCE
ANDREW C. JACOBS
MARCUS R. PATILLO
Assistant District Attorneys

Counsel for Appellant,
J.C., Child

Counsel for Appellee,
State of Louisiana

* * * * *

Before MOORE, PITMAN, and COX, JJ.

**PITMAN, J**.

J.C. appeals the trial court's determination that he had the mental capacity to proceed. For the following reasons, we affirm the trial court's determination and J.C.'s adjudication and disposition. We remand for the trial court to provide J.C. with written notice of the requirements for registration as a sex offender.

## FACTS

On June 8, 2018, the state filed an amended petition charging J.C., a juvenile whose date of birth is July 8, 2004, with first degree rape.

J.C.'s counsel requested a competency determination, and the trial court appointed Dr. Perry Hill, a licensed psychologist, and Dr. Pamela McPherson, a medical doctor practicing psychiatry, to evaluate J.C. Drs. Hill and McPherson both submitted written reports.

In his report, Dr. Hill stated that he evaluated J.C. in July 2018 and previously evaluated him in November 2017.[1] He stated that J.C. demonstrated marginal intellectual functioning, with related immaturity in reasoning and decision making. Regarding his awareness of the nature of legal proceedings, Dr. Hill stated that J.C.:

1. Has an incomplete and immature understanding of the nature of the charge against him, as well as the seriousness of the charge;
2. Is able to distinguish between a guilty and not guilty pleas;
3. Shows a partial understanding of consequences of either plea;
4. Does not demonstrate an understanding of defenses available to him;
5. Has partial understanding of the roles of Judge, Defendant, Prosecutor, and Defense Counsel;

---

[1] In August 2017, J.C. was charged with sexual battery. The trial court ordered a mental examination, and Dr. Hill evaluated J.C. A November 29, 2017 minute entry stated that J.C. lacks mental capacity to proceed. On December 13, 2017, the trial court adjudicated J.C. ungovernable and ordered him to serve one year of probation.

6. Appears to understand possible verdict a Judge may reach if he[] were to go to trial; and,
7. Has an incomplete and immature understanding of consequences of a conviction.

Regarding J.C.'s ability to assist counsel in his defense, Dr. Hill found:

1. [J.C.] is able to recall and relate facts pertaining to his actions and whereabouts in regards to the alleged offense;
2. Should be able to assist counsel in locating and examining any relevant witnesses;
3. Would probably be able to attend to testimony of witnesses and inform his lawyer of any factual misstatements (provided he takes prescribed medications and is given specific instruction by his lawyer to attend to the testimony as it occurs);
4. His attention and concentration may wane in the event of hearings that last more than 50 to 60 minutes;
5. Shows immature decision making in response to well-reasoned alternatives;
6. Has some negative appraisal of his attorney (though it is uncertain if this would negatively affect his motivation to work cooperatively with his attorney); and,
7. Would likely experience some difficulty with self-expression if he were to testify in his own defense (could possibly be mitigated by careful and precise questioning).

In Dr. McPherson's report, she stated:

Based on my evaluation and the records available to me it is my opinion with reasonable medical certainty that [J.C.] currently suffers a mental defect of ADHD and conduct disorder. His intellect is estimated in the borderline range. [J.C.] played with toys and frequently laughed with amusement pointing out that I was asking the same questions as Dr. Hill. Although he is immature for his age and thinks like a 10 or 11 year old, it is my opinion that he would achieve competency if offered restoration services.

Noting that questions remained after its review of the reports, the trial court ordered a special hearing, which was held on September 6, 2018.

Dr. Hill testified that J.C. would have difficulty assisting counsel, making decisions and expressing his thoughts and opinions in the courtroom. He stated that J.C. showed deficiencies with cognitive skills as compared to what is expected from a typical 14-year-old. He opined that J.C. would have

2

difficulty looking at a situation from different perspectives, weighing possible consequences and constricting impulsive responses and negative emotional reactions and that these deficiencies would hinder his abilities to help his defense counsel develop a strategy and to understand the strategy. He opined that remediation would not help J.C. in those areas because reasoning and judgment are rooted in his delayed development, which cannot be accelerated. He further stated that J.C. had an incomplete and immature understanding of the charges against him. He noted that J.C. understood the basics of the court process and would be able to comprehend what was going on at trial as long as the language used was not too complex and court proceedings were conducted in 45- to 50-minute increments to help his attention span. He stated that J.C. understands the difference between right and wrong and could tell his version of what took place.

Dr. McPherson testified that she evaluated J.C. in July 2018. She expressed concern with J.C.'s expressive language ability and his ability to process information due to his inability to understand questions and formulate answers. Regarding his mental status, she noted that his cognitive functioning was at a borderline range, he was inattentive at times and he played with toys in her office, which was behavior more typical of a child younger than 14. She stated that overall, J.C. was more like an 11-year-old than a 14-year-old. Regarding J.C.'s mental health, she did not find any psychosis, delusions or bizarre behaviors. She noted that he acted amused at inappropriate times and did not appreciate the seriousness of the evaluation. She further stated that he referred to things he learned during his evaluation with Dr. Hill, which showed his ability to grasp and retain facts. She noted that he understood that the charge of second degree rape was a serious

3

charge, but did not know the possible penalties, which suggested to her that he did not understand the seriousness of the offense. He understood the meaning of guilty and not guilty, but did not understand the concept of a plea bargain or the roles of the attorneys, judge and witnesses. She believed that at the time of the evaluation, he did not have sufficient understanding of the courtroom procedures and the seriousness of the offense or the ability to his assist his attorney. She opined that the greatest likelihood of attaining those understandings and abilities would be through restoration services. Additionally, she recommended an assessment of expressive language and an intellectual testing to understand how he processes information and expresses himself. She agreed with Dr. Hill that J.C. would need accommodations in the courtroom. She noted that he had had two significant head injuries and that intellectual testing was needed to understand his cognitive function so that she could give recommendations regarding accommodations.

The trial court determined, by a preponderance of the evidence, that J.C. was competent and had the mental capacity to proceed at trial. It noted its reservations about certain defects and ordered the Department of Health and Hospitals to provide restoration services prior to trial. J.C.'s counsel objected to the finding of competency, noting that he believed J.C. must be found incompetent to receive restoration services. The trial court responded that "the Court of Appeal may say I'm splitting the baby," but considering the totality of the circumstances, it found J.C. to be competent, but in need of restoration services as suggested by Dr. McPherson.

On September 10, 2018, the trial court signed an order stating that it found J.C. to be competent and that the delinquency proceeding shall be

4

resumed. It also ordered that the Department of Health and Hospitals provide restoration services to J.C. and provide the court with written updates on his progress.

In a letter dated December 26, 2018, Jessica Latin, a juvenile competency restoration provider with the Shreveport Behavioral Health Clinic, notified the trial court that J.C. successfully completed the juvenile competency restoration classes and scored a passing grade of 86% on a test that assessed his knowledge of the legal system. She appeared in court on January 2, 2019, and the trial court noted her report.

At the beginning of the adjudication hearing on February 27, 2019,[2] the trial court noted that breaks would be taken approximately every hour to help J.C.'s ability to focus and that additional breaks could be requested.

S.C., the minor victim, testified that between 5:00 and 6:00 in the afternoon on April 25, 2018, she was walking to church when she passed by a recreation center where J.C. was present. He asked her if she was still upset about a previous incident, and she replied "no" and continued walking. J.C. went into the recreation center, collected his belongings and began following her. He caught up to her, grabbed her arm and pulled her onto a trail in a wooded area. They wrestled as she tried to free herself from his grasp, and she fell to the ground. He pulled down her pants, and she pulled them back up. He held her on the ground so that she could not move, then pulled down his pants and penetrated her with his penis. The attack lasted approximately five minutes, and then J.C. pulled his pants up and walked

---

[2] At a pretrial hearing, the court ruled that testimony regarding a July 2016 alleged sexual assault and the August 2017 sexual battery were admissible at the adjudication hearing.

away. S.C. then continued walking to church. She testified that she and J.C. were never in a relationship, that she did not consent to having sex with him and that she verbally told him to get off of her and leave her alone. She stated that J.C. did not threaten her, but used force by holding her down.

S.C. also testified about the July 2016 incident that J.C. referenced during the April 2018 incident. She was home alone in her bedroom at night and had forgotten to lock the back door, when J.C. entered the house. She asked him, "[W]hat are you doing in my house," and he did not respond. He attacked her, and they began to wrestle. As she tried to get him off of her, he forced her onto the floor in front of her bathroom and pulled down her pants and underwear. He then heard her brother enter the house, so he jumped out of the bathroom window.

Joyce Mauldin, who was 68 at the time of the adjudication hearing, testified that on August 4, 2017, she heard a knock on the door. J.C. was at the door and stated that his nose was bleeding, and he asked for tissues. She went to the bathroom to retrieve the tissues. When she returned, J.C. touched her "below" in a sexual manner. He put his arms around her and threw her on the couch, and she struggled to loosen herself from his tight grasp. She stated that she would tell what he had done, and he ran out of her house.

The defense called several alibi witnesses. Although each testified that J.C. played basketball at the recreation center on April 25, 2018, the details they offered were inconsistent.

J.C. testified about the alleged July 2016 incident. He stated that S.C. and a friend came to his house and then the three of them went to the house of another friend. While there, S.C. asked him if he wanted to have sex. He

replied that he did. S.C. invited him into her house, and they went to her bedroom. He asked her if she wanted to pull her clothes down, and she responded that she did, so he removed her clothing. S.C.'s brother then began knocking on the back door, so he became scared and climbed out of the window. He denied that he tried to rape S.C. while in her house. He further testified that he did not rape S.C. during the alleged April 2018 incident. He stated that he was playing basketball all day and never saw her. He also testified that he had never had sex with S.C.

S.C. testified as a rebuttal witness and stated that she did not invite J.C. into her house in July 2016. She confirmed that all of her testimony was true.

The trial court adjudicated J.C. delinquent for the offense of second degree rape, a responsive verdict.

At the disposition hearing on June 12, 2019, the trial court imposed a four-year disposition, with two years suspended; ordered that J.C. serve the remainder in a non-secure facility; and recommended him for a sex offender treatment program. It filed a judgment of disposition.

J.C. appeals the trial court's determination that he had the mental capacity to proceed.

**DISCUSSION**

In his sole assignment of error, J.C. argues that the trial court erred in determining that he had the mental capacity to proceed to trial. He states that neither Dr. Hill nor Dr. McPherson found that he was competent at the time of the 2018 examinations. He contends that the trial court's actions were inconsistent when it found that he had the capacity to proceed, but then ordered restoration services. He argues that the trial court's use of hybrid

procedures deprived him of statutory presumptions and the right to a second mental examination as provided in La. Ch. C. art. 838. He contends that he should be accorded the right to a *nunc pro tunc* mental examination or a new adjudication hearing.

The state argues that the trial court was not clearly wrong in concluding that the testimony failed to establish by a preponderance of the evidence that J.C. did not have the capacity to proceed. It notes that the trial court heard favorable testimony regarding his abilities to proceed to trial. It states that the fact that the trial court wanted to provide restoration services to J.C. for his benefit is not inconsistent with a finding of capacity to proceed or proof of manifest error.

The provisions of the Children's Code shall be liberally construed to the end that each child coming within the jurisdiction of the court shall be accorded due process. La. Ch. C. art. 102. The provisions of the Children's Code shall be construed to secure simplicity in procedure, fairness in adjudication and administration and the elimination of unjustifiable delay. *Id*. The provisions of the Children's Code shall apply in all juvenile court proceedings. La. Ch. C. art. 103. The procedures used to determine a child's mental capacity to proceed are set forth in La. Ch. C. arts. 832–838.

A child's mental incapacity to proceed may be raised at any time by the child, the district attorney or the court. La. Ch. C. art. 832. The court shall order a mental examination of the child when it has reasonable grounds to doubt the mental capacity of the child to proceed. La. Ch. C. art. 833(A). Within seven days after a mental competency examination is ordered, the court shall appoint a competency commission to examine and report on the mental condition of the child. La. Ch. C. art. 834(A)(1). La. Ch. C.

8

art. 835(B) sets forth the required contents of the commission's report and states in pertinent part that the report shall include:

> (6)  A description of the child's abilities and deficits in the following mental competency functions, coupled with the reasons therefor:
> (a)  Understanding and appreciation of the nature and object of the proceedings.
> (b)  Comprehension of his situation in relation to the proceedings.
> (c)  Rendering assistance to defense counsel in preparation of the case.

The issue of the mental capacity of the child to proceed shall be determined by the court after a contradictory hearing.  La. Ch. C. art. 836(A).  If the court determines that the child has the mental capacity to proceed, the delinquency proceedings shall be resumed.  La. Ch. C. art. 837(A).  If the court determines by a preponderance of the evidence that the child lacks the mental capacity to proceed and the alleged delinquent act is a felony, La. Ch. C. art. 837(B) provides that the court may:

> (1) Dismiss the petition in accordance with Article 876.
> (2) Adjudicate the family of the child to be in need of services and proceed to a disposition in accordance with Chapters 10 and 12 of Title VII.
> (3) Commit the child to the Louisiana Department of Health, a private mental institution, or an institution for persons with mental illness in accordance with Louisiana Department of Health policy. The court may also order restoration services for the child and appoint a restoration service provider. . . .
> (4) Place the child in the custody of his parents or other suitable person or private or public institution or agency under such terms and conditions as deemed in the best interests of the child and the public, which conditions may include the provision of outpatient services by any suitable public or private agency. The court may also order restoration services for the child and appoint a restoration service provider.

In the case *sub judice*, the trial court did not err in determining that J.C. had the mental capacity to proceed, and its finding is supported by the record.  The juvenile court considered the reports and testimony of Dr. Hill

9

and Dr. McPherson, which are detailed above, and found that he had the requisite capacity to proceed. Neither Dr. Hill nor Dr. McPherson came to a conclusion regarding his mental capacity to proceed and, instead, left that determination to the trial court. Although the trial court found that, by a preponderance of the evidence, J.C. had the mental capacity to proceed, it had reservations about certain defects noted by Dr. Hill and Dr. McPherson and ordered restoration services to ensure that any deficiencies were corrected prior to trial. At the adjudication hearing, it provided the accommodations suggested by Dr. Hill and used simple language and provided frequent breaks.

We note that the trial court's action of ordering restoration services after finding J.C. to have the capacity to proceed did not strictly adhere with La. Ch. C. art. 837. It acknowledged that this action might be seen as "splitting the baby." However, nothing in the Children's Code states that restoration services cannot be provided once a juvenile is found to have the capacity to proceed. The trial court's ordering of restoration services provided J.C. with more services than those contemplated in La. Ch. C. art. 837. Therefore, considering the facts specific to this case, its ordering of restoration services did not negate its determination that J.C. had the mental capacity to proceed.

Although J.C. argues that he has a right to a second examination upon his completion of restoration services, La. Ch. C. art. 838 does not provide for a second examination under the circumstances of this case. Article 838 establishes the procedure for when capacity is regained after a child's commitment, and J.C. was not committed to an institution.

Accordingly, this assignment of error lacks merit.

10

**ERROR PATENT**

La. Ch. C. art. 884.1(A)(2) requires that when a child has been adjudicated delinquent for the offense of second degree rape, the trial court shall provide him with written notice of the requirements for registration as a sex offender. A review of the record demonstrates that the trial court failed to provide this notice to J.C. Accordingly, we remand this case for the trial court to provide J.C. the required written notification as to the sex offender registration requirements and to file written proof of such notice in the record of the proceedings.

**CONCLUSION**

For the foregoing reasons, we affirm the trial court's determination that J.C. had the mental capacity to proceed. We also affirm J.C.'s adjudication and disposition and remand for the trial court to provide J.C. with written notice of the requirements for registration as a sex offender.

**AFFIRMED; REMANDED FOR NOTIFICATION OF REQUIREMENTS FOR REGISTRATION AS A SEX OFFENDER.**